[Cite as *Williams v. Kisling, Nestico, & Redick, L.L.C.*, 2022-Ohio-1044.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

MEMBER WILLIAMS, et al.

     Appellees

     v.

KISLING, NESTICO, & REDICK, LLC., et al.

     Appellants

C.A. Nos.     29630
               29636

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     CV-2016-09-3928

DECISION AND JOURNAL ENTRY

Dated: March 30, 2022

---

CARR, Judge.

{¶1} Appellants, Dr. Sam Ghoubrial and the law firm of Kisling, Nestico, and Redick ("KNR"), appeal the judgment of the Summit County Court of Common Pleas. This Court affirms in part and reverses in part.

I.

{¶2} The instant appeal arises out of a class action lawsuit alleging unlawful business practices by KNR and several healthcare providers. The trial court ultimately certified two classes pursuant to Civ.R. 23, one involving an alleged price-gouging scheme and the other involving an alleged bogus investigation fee charged by KNR.

{¶3} This matter was pending in the Summit County Court of Common Pleas for several years before the sixth amended complaint was filed with leave of court in 2019. A number of defendants and claims were added as the litigation progressed over time. In the sixth amended complaint, the named class representatives were Member Williams, Thera Reid, Monique Norris,

and Richard Harbour, all of whom were KNR clients who sought treatment from healthcare providers recommended by the firm. The named defendants were Dr. Ghoubrial, Dr. Minas Floros, and KNR, as well as Alberto Nestico and Robert Redick in their capacities as owners of KNR. Dr. Ghoubrial is a medical doctor who operates a pain management clinic. Dr. Floros is a chiropractor who frequently treats individuals involved in car accidents. KNR is a law firm with a large personal injury practice.

{¶4} The sixth amended complaint alleged three fraudulent schemes perpetrated by KNR.

{¶5} The first set of claims involved an alleged price-gouging scheme between KNR and certain healthcare providers. Specifically, the plaintiffs sought to pursue claims of fraud, breach of fiduciary duty, unjust enrichment, unconscionable contract, and violations of the Ohio Corrupt Practices Act on behalf of KNR clients who were allegedly charged "exorbitantly inflated prices for medical treatment and equipment provided by KNR's 'preferred' healthcare providers pursuant to a price-gouging scheme by which the clients were pressured into waiving insurance benefits that would have otherwise protected them[.]" The named plaintiffs for these claims were Reid, Norris, and Harbour, in addition to Class A.

{¶6} The second set of claims involved an allegedly fraudulent charge imposed on KNR clients that served as a kickback to chiropractors in KNR's referral network. The plaintiffs sought to pursue claims of fraud, breach of fiduciary duty, and unjust enrichment on behalf of KNR clients who were allegedly charged "a sham narrative fee that KNR paid as a kickback to select chiropractors as compensation for referrals and participation in the price-gouging scheme[.]" The named plaintiffs for these claims were Reid and Norris, in addition to Class B.

**{¶7}** The third set of claims involved an allegedly bogus fee charged to KNR clients for investigative services. The plaintiffs sought to pursue claims of fraud, breach of contract, breach of fiduciary duty, and unjust enrichment on behalf of former KNR clients who were allegedly charged "a bogus 'investigation' fee deducted from their settlement to pay so-called 'investigators' whose job was primarily to chase new clients down to sign them up before they could sign with a competing firm." The named plaintiffs for these claims were Williams, Reid, Norris, Harbour, in addition to Class C.

**{¶8}** With respect to the definition of classes pursuant to Civ.R. 23, the plaintiffs sought to certify the following three classes:

[Class A]

All current and former KNR clients who had deducted from their settlements any fees paid to Defendant Ghoubrial's personal-injury clinic for trigger-point injections, TENS units, back braces, kenalog, or office visits, billed pursuant to the clinic's standard rates from the date of its founding in 2010 through the present.

[Class B]

All current and former KNR clients who had deducted from their settlements a narrative fee paid to (1) Dr. Minas Floros of Akron Square Chiropractic, (2) all other chiropractors employed at clinics owned by Michael Kent Plambeck, and (3) certain other chiropractors identified in KNR documents as "automatic" recipients of the fee, from KNR's founding in 2005 to the present.

[Class C]

All current and former KNR clients to whom KNR charged sign-up fees paid to AMC Investigations, Inc., MRS Investigations, Inc., or any other so called "investigators" or "investigation" company, from 2008 to the present.

**{¶9}** The defendants denied the allegations in their respective answers and asserted a number of affirmative defenses. The parties submitted a bevy of evidence and engaged in

extensive briefing on the plaintiffs' motion for class certification. The trial court permitted supplemental briefing on several issues and held oral arguments.[1]

{¶10} On December 17, 2020, the trial court issued a journal entry granting the motion to certify in part and denying it in part. As to Class A, the trial court found that the claims of fraud, breach of fiduciary duty, unjust enrichment, and unconscionable contract "are appropriate claims for class action against all Defendants except [Dr.] Floros, and the breach of fiduciary duty claim as to Dr. Ghoubrial." The trial court also found there was no evidence to support the claim alleging violations of the Ohio Corrupt Practices Act claim against any defendant named in regard to Class A. The trial court denied the motion to certify as it pertained to Class B. The trial court granted the motion to certify Class C against KNR, and its individually named owners.

{¶11} KNR has appealed and raises two assignments of error. Dr. Ghoubrial raises one assignment of error. This Court consolidates certain assignments of error to facilitate review

II.

**BACKGROUND**

{¶12} One of the foundational allegations underpinning the plaintiffs' claims is that KNR functions as a settlement mill, a type of law firm that grew in prominence after the United States Supreme Court held that rules restricting the advertisement of legal services were unconstitutional in *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 (1977). The plaintiffs attached to their complaint an affidavit from Nora Freeman Engstrom, a Stanford Law School professor who specializes in legal ethics and tort law. Professor Engstrom averred that "[s]ettlement mills are: (1) high-volume personal-injury law practices, that (2) engage in

---

[1] The process of briefing the motion for class certification commenced prior to the time that the trial court granted leave to file the sixth amended complaint.

aggressive advertising from which they obtain a high proportion of their clients, (3) epitomize 'entrepreneurial legal practices,' and (4) take few, if any, cases to trial." In addition to these core characteristics, Professor Engstrom further explained that "settlement mills tend to, but do not always: (5) charge tiered contingency fees; (6) fail to engage in rigorous case screening and thus primarily represent accident victims with low-dollar (often, soft-tissue injury) claims; (7) fail to prioritize meaningful attorney-client interaction; (8) incentivize settlements via mandatory quotas imposed on their employees or by offering negotiators awards or fee-based compensation; (9) resolve cases quickly, usually within two-to-eight months of the accident; and (10) rarely file lawsuits." Professor Engstrom also discussed the predicament of "[m]edical buildup" in cases handled by settlement mills, a practice by which injuries are exaggerated and overtreated in order to increase the value of a case.

{¶13} Professor Engstrom averred that based on her review of the deposition testimony given in this case, KNR fits within the definition of a settlement mill. Professor Engstrom cited a number of factors in reaching this conclusion, noting that KNR maintains an extraordinary case load, spends a large amount of money on advertising, takes comparatively few cases to trial while strongly encouraging settlements, and approaches the practice of law from an entrepreneurial perspective. Several of the secondary factors were present as well, according to Professor Engstrom. KNR charges clients via contingency fees, though the firm does not maintain a tiered contingency fee system. Professor Engstrom observed that KNR's case screening is less than rigorous and the firm primarily represents accident victims with soft-tissue injuries. Professor Engstrom further averred that KNR attorneys do not maintain meaningful attorney-client interactions and exhibit a strong preference for settling cases in a systematic, expedited manner as opposed to filing lawsuits.

{¶14} In the sixth amended complaint, the plaintiffs alleged that KNR's settlement mill business model served as the fulcrum for three fraudulent schemes perpetrated by the firm and its preferred healthcare providers. The basic tenets of the three alleged schemes alleged in the sixth amended complaint are as follows.

{¶15} The alleged price-gouging scheme began with a quid pro quo referral network involving KNR, chiropractors such as Dr. Floros, and Dr. Ghoubrial. Both KNR and its preferred chiropractors pursued automobile accident victims with soft-tissue injuries through advertising campaigns and an array of investigative tactics. Upon identifying and securing clients, KNR and the chiropractors traded a high volume of referrals. The clients entered in a contingency fee arrangement with KNR where the firm would receive a percentage of the legal settlement as its fee for legal services. The agreement further authorized KNR to pay the costs of the client's medical treatment out of the gross settlement proceeds. Allegedly, with the aim of increasing the value of each case, the clients were encouraged to seek ongoing chiropractic care and additional medical treatment. Both KNR and the chiropractors strongly encouraged clients to seek additional pain management treatment from Dr. Ghoubrial. Dr. Ghoubrial charged above-market rates for trigger-point injections, TENS units, and back braces. Dr. Ghoubrial's personal injury clinic does not accept health insurance and clients are often not informed of the cost of the medical care. Dr. Ghoubrial required his patients to sign a form allowing for collection of his bills out of the legal settlements secured by KNR. The plaintiffs alleged that KNR prepared this form. The lack of involvement of insurance companies removes a control on what can be charged for medical care. KNR paid its preferred health care providers a disproportionately high sum of money to satisfy the medical bills out of its clients' settlements. The plaintiffs alleged that KNR profited from the

scheme by cycling a large number of clients through the system and settling cases with a high rate of efficiency prior to taking them to trial.

{¶16} The second alleged scheme centered on a "narrative fee" that served as a kickback to chiropractors who directed a large number of clients to KNR. When done properly, medical narrative reports are created by obtaining information from a patient about their case that might not appear in standard medical records. Whether a narrative report is necessary is a determination that is typically made on a case-by-case basis by the attorney representing the patient. The plaintiffs alleged that regardless of the circumstances of each client's case, KNR management insisted on the creation of narrative reports as standard practice on cases handled by chiropractors who referred a high volume of cases to KNR, such as Dr. Floros. The chiropractors used template forms to create reports that did not benefit the clients in any discernable way. The fee associated with the creation of the narrative report served as a kickback to the chiropractors to reward them for their referrals.

{¶17} The third alleged scheme involved an "investigation" fee charged to all KNR clients who obtained settlements. The plaintiffs alleged that the $50 to $100 fee effectively constituted a double charge for services that were already subsumed within the contingency fee agreement. Although the fee purportedly constituted reimbursement to an investigative firm that worked on each case, the plaintiffs alleged that it actually represented the cost of basic marketing and the performance of administrative tasks that are standard to any law practice. The plaintiffs alleged that the fee could more accurately be described as a "sign-up" fee that covered expenses related to obtaining standard information from new clients and getting them to sign an engagement letter with KNR. The fee was allegedly charged on all cases, even when the investigators did not work on the case.

{¶18} The trial court ultimately issued a journal entry granting the motion to certify in part and denying it in part.

{¶19} In granting the motion to certify, in part, with respect to Class A, the trial court determined that certain aspects of the alleged price-gouging scheme involved common questions that could be resolved by common evidence in a single adjudication. The trial court rejected that portion of the alleged scheme pertaining to the solicitation and referral of clients, stressing that the evidence showed that KNR and its preferred chiropractors obtained clients in a number of ways that fell outside the parameters of the alleged conspiracy and, further, that Dr. Floros had no involvement whatsoever with many of the class members. In regard to the portion of the scheme that alleged a price-gouging arrangement between KNR and Dr. Ghoubrial, the trial court stated as follows:

> Evidence was presented that many of Dr. Ghoubrial's patients were administered trigger point injections and sold TENS units and back braces. Evidence was presented that Dr. Ghoubrial substantially overcharged his patients for these items. There was evidence that only Nestico was authorized to reduce Dr. Ghoubrial's bills and the reductions when they were made [were] only a twenty percent reduction. * * * There was evidence presented that although more than 50% of Dr. Ghoubrial's personal injury patients were covered by some form of health insurance, he required the patients to make payments out of the settlement proceeds. It is also undisputed that KNR prepared the letter o[f] protection on Ghoubrial's stationary to insure the payment was made. It is clear that payments made to Dr. Ghoubrial in this manner insured the charges he made would escape scrutiny by the insurance carriers and other government agencies. * * * The argument by Dr. Ghoubrial and KNR that there are no common questions which predominate because some of Dr. Ghoubrial's patients received a reduction in their charges for these items is not persuasive.

{¶20} The trial court further found that a class action was the superior method for litigating the claims for Class A as eligible class members would realize no benefit by filing their own separate lawsuits and the cost of such litigation would otherwise be prohibitive. While the trial court acknowledged that there might be some difficulties in the management of the class

action, those difficulties were not so burdensome as to deny class certification. The trial court observed that Dr. Ghoubrial's patients who did not receive reductions could form a class and those who did could be placed in a sub-class in accord with the percentage of the reduction.

{¶21} The trial court denied the motion to certify as to Class B, the narrative fee class, concluding that the evidence showed that whether an individual class member's narrative report was of value depended upon the circumstances of each case and would require independent scrutiny of statements provided by each client, as well as the attorneys and claims examiners who handled those cases. The evidence showed that many of the narrative reports did have value because they contained information that that was not available in medical records. Accordingly, the trial court concluded that the plaintiffs failed to demonstrate that questions of fact common to Class B predominated over questions impacting individual class members.

{¶22} In granting the motion to certify as to Class C, the trial court found that all plaintiffs were subject to the same alleged conduct, namely a standardized fee deducted from each settlement where no investigation was provided and KNR could not provide an accounting for the alleged investigatory services. The trial court granted the motion to certify on the basis that the plaintiffs' claims pertaining to the alleged bogus investigative fee could be determined by common evidence and that a class action was a superior method for litigating the claims given that the cost of litigation would otherwise be prohibitive and class members would receive no benefit by trying their cases individually. The trial court further found that if the plaintiffs demonstrated at trial that the fee was illegitimate, disgorgement of the fee was an appropriate remedy.

## KNR'S FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN CERTIFYING CLASS A – THE "PRICE-GOUGING" CLASS ON CLAIMS ONE (FRAUD), TWO (BREACH OF FIDUCIARY DUTY), THREE (UNJUST ENRICHMENT), AND FOUR

(UNCONSCIONABLE CONTRACT) OF THE SIXTH AMENDED COMPLAINT.

### DR. GHOUBRIAL'S ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN CERTIFYING CLASS A, THE "PRICE GOUGING-CLASS" ON CLAIMS ONE FOR FRAUD, THREE FOR UNJUST ENRICHMENT, AND FOUR FOR UNCONSCIONABLE CONTRACT FROM THE SIXTH AMENDED COMPLAINT.

**{¶23}** KNR and Dr. Ghoubrial have raised assignments of error arguing that the trial court abused its discretion in certifying Class A, the price-gouging class, because it failed to conduct a rigorous analysis as required by Civ.R. 23. KNR and Dr. Ghoubrial maintain that it is not possible for the plaintiffs to establish liability or damages in regard to Class A in a single adjudication with evidence common to all class members.

**{¶24}** An appellate court reviews a trial court's order certifying a class pursuant to Civ.R. 23 for an abuse of discretion. *Setliff v. Morris Pontiac, Inc.*, 9th Dist. Lorain No. 08CA009364, 2009-Ohio-400, ¶ 5. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶25}** "The following seven requirements must be satisfied before an action may be maintained as a class action under Civ.R. 23: (1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be met." *Hamilton v. Ohio Savs. Bank*, 82 Ohio St.3d 67, 71 (1998), citing Civ.R. 23(A), (B).

**{¶26}** Civ.R. 23(B)(3) provides as follows:

A class action may be maintained if Civ.R. 23(A) is satisfied, and * * * the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(a) the class members' interests in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and

(d) the likely difficulties in managing a class action.

**{¶27}** "When determining whether to certify a class, a trial court must conduct a rigorous analysis, and it may grant certification only after resolving all relevant factual disputes and finding that sufficient evidence proves that all requirements of Civ.R. 23 have been satisfied." *Cullen v. State Farm Mut. Auto. Ins. Co.*, 137 Ohio St.3d 373, 2013-Ohio-4733, ¶ 2. "A party seeking certification pursuant to Civ.R. 23 bears the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements set forth in the rule." *Cullen* at paragraph three of the syllabus.

**{¶28}** "Certification pursuant to Civ.R. 23(B)(3) requires the trial court to make two findings: first, that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and, second, that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." (Internal quotations omitted). *Cullen* at ¶ 29. "For common questions of law or fact to predominate, it is not sufficient that such questions merely exist; rather, they must present a significant aspect of the

case. Furthermore, they must be capable of resolution for all members in a single adjudication." *Id.* at ¶ 30, quoting *Marks v. C.P. Chem. Co., Inc.*, 31 Ohio St.3d 200, 204 (1987).

**{¶29}** In support of its position that the trial court failed to adequately analyze the predominance requirement set forth in Civ.R. 23(B), KNR argues that the trial court failed to address how it would be possible to determine KNR's responsibility for the charges that Dr. Ghoubrial imposed on his patients by evidence common to all class members in a single adjudication. KNR makes a similar argument in regard to the trial court's finding that disgorgement would be an appropriate remedy, contending that independent scrutiny of each class member's case would be required in order to determine how the inflated charges for medical care ultimately impacted the settlement amount in each client's case.

**{¶30}** Dr. Ghoubrial similarly argues that thousands of mini trials would be required in order to resolve the liability issues involved with alleged price-gouging scheme, given that the evidence showed that the course of medical treatment varied from patient to patient and his standard rates evolved over the course of time. Dr. Ghoubrial maintains that the trial court failed to conduct a rigorous analysis regarding whether it would be possible for the plaintiffs to demonstrate that they were in fact injured in a class action setting, given that almost all class members received a reduction in their medical bills. Stressing that the amount of the reductions varied significantly depending on the circumstances of each case, Dr. Ghoubrial argues that the proposed remedy of disgorgement would be untenable in a class action.

**{¶31}** A trial court abuses its discretion when it certifies a class action prior to conducting a rigorous analysis of all the requirements set forth in Civ.R. 23. *Mozingo v. 2007 Gaslight Ohio, LLC.*, 9th Dist. Summit Nos. 26164, 26172, 2012-Ohio-5157, ¶ 8, 17. Civ.R. 23(B)(3) specifically requires a trial court to make findings with respect to predominance and superiority prior to

certifying a class action. *Cullen*, 137 Ohio St.3d 373, 2013-Ohio-4733, at ¶ 29. "This inquiry requires a court to balance questions common among class members with any dissimilarities between them, and if the court is satisfied that common questions predominate, it then should 'consider whether any alternative methods exist for resolving the controversy and whether the class action method is in fact superior." *Id.*, quoting *Ealy v. Pinkerton Govt. Servs. Inc.*, 4th Cir. No. 12-1252, 2013 WL 980035, *7 (Mar. 14, 2013).

{¶32} The alleged price-gouging scheme pertinent to Class A was the most elaborate of the three fraudulent schemes set forth in the sixth amended complaint. Although the trial court found that there was no basis to certify the class in regard to the alleged unlawful referral network, it certified Class A with respect to a number of claims pertaining to the portion of the scheme whereby KNR conspired with Dr. Ghoubrial to overcharge clients for medical care with the aim of increasing the value of each client's legal settlement. A careful review of the trial court's journal entry in this matter reveals that it failed to conduct a rigorous analysis with respect to the predominance and superiority requirements as to Class A. Accordingly, this matter must be remanded for the trial court to conduct that analysis in the first instance.

{¶33} While the trial court carefully identified many of the arguments advanced by the parties with respect to the certification of Class A, it failed to ultimately resolve some of the foremost evidentiary conflicts regarding whether the plaintiffs' claims could be resolved by evidence common to all parties in a single adjudication. *See Cullen* at ¶ 16 (concluding that the rigorous analysis required under Civ.R. 23 "requires the court to resolve factual disputes relative to each requirement and to find, based upon those determinations, other relevant facts, and the applicable legal standard, that the requirement is met").

{¶34} Perhaps most notably, the trial court failed to undertake a rigorous analysis of how the plaintiffs could prove liability with common evidence when the evidence showed that the individual class members were not similarly situated with respect to health insurance coverage. One of the core allegations of the price-gouging scheme was that class members were overcharged for medical care compared to what would have been charged had they been able to use health insurance. Many class members who sought treatment from Dr. Ghoubrial did not have health insurance at all. Some members, such as class representative Richard Harbour, maintained health insurance coverage but expressed a preference not to use it for the purposes of pain management treatment. Still other class members were willing to use either Medicare or their private health insurance but were forced not to do so in order to obtain treatment from Dr. Ghoubrial. The trial court made a general finding that KNR and Dr. Ghoubrial conspired to remove insurance companies from the equation so that Dr. Ghoubrial's charges "would escape scrutiny by the insurance carriers and other government agencies." Notably, however, the trial court declined to analyze how the plaintiffs could prove their claims by common evidence under circumstances where the insurance situations of the individual class members varied.

{¶35} Furthermore, in addressing the contention by KNR and Dr. Ghoubrial that the plaintiffs could not satisfy the predominance requirement regarding the payment plan because some patients received significant reductions in their charges for medical care, the trial court simply found that this argument was "not persuasive" and cited a number of cases in support of the proposition that individual differences among class members with respect to damages will not defeat class certification.[2] The trial court also suggested that "[Dr. Ghoubrial['s] patients who did

---

[2] The trial court cited and discussed *Vinci v. Am. Can Co.*, 9 Ohio St.3d 98 (1984), as well as this Court's decision in *Mozingo v. Gaslight Ohio, LLC*, 9th Dist. Summit No. 27759, 2016-Ohio-4828.

not receive reductions could form a class and those who did could be placed in a sub-class of the price-gouging class representing the percentage of reduction." The Supreme Court has held that "[p]laintiffs in class-action suits must demonstrate that they can prove, through common evidence, that all class members were in fact injured by the defendant's actions." *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St.3d. 329, 2015-Ohio-3430, ¶ 33. Here, resolution of the plaintiffs' claims with respect to the price-gouging scheme will at a minimum require determinations with respect to whether Dr. Ghoubrial's standardized rates constituted an overcharge for medical care and equipment, the extent to which Dr. Ghoubrial's clinic ultimately accepted reduced payments as satisfaction for each patient's bill, as well as the manner in which KNR attorneys played an active role in facilitating those reductions based on the settlement value of each case in order to perpetuate the scheme. The trial court failed to undertake a rigorous analysis as to whether these issues could be resolved by common evidence in a single adjudication. *See Cullen* at ¶ 30.

**{¶36}** Finally, the trial court did not conduct a rigorous analysis when it summarily concluded that disgorgement was an appropriate remedy. In its judgment entry, the trial court stated, "Dr. Ghoubrial would be required to disgorge to the class members the amount of the overcharge. KNR would be required to disgorge the amount of the contingent fee attributable to the overcharges made by Dr. Ghoubrial. For example, if the settlement amount was increased by $4,000.00 in overcharge, and KNR's contingent fee was one-fourth of the recovery, then KNR

would have to disgorge $1,000.00 of the fee as to that class member." The trial court's damages formula involves identifying the amount of the overcharge in each class member's case. As discussed above, the calculation of the overcharge would involve a number of considerations. In addition to the fact that not all class members received the same course of treatment, the record suggests that some of Dr. Ghoubrial's patients received little to no reduction in their medical bills while other patients received significant reductions. The trial court did not scrutinize whether the calculation of the overcharge could be established by common evidence in a single adjudication.

{¶37} This Court functions as a court of review and we exceed the scope of our authority when we analyze issues in the first instance that have not first been addressed by the trial court. *See generally Guappone v. Enviro-Cote, Inc.*, 9th Dist. Summit No. 24718, 2009-Ohio-5540, ¶ 13. As the trial court here failed to undertake a rigorous analysis of the requirements of Civ.R. 23(B) with respect to the price-gouging class, this matter must be remanded for the trial court to undertake that analysis in the first instance. *See Midland Funding LLC v. Colvin*, 3d Dist. Hancock No. 5-18-15, 2019-Ohio-5382, ¶ 53. This Court takes no position as to whether the trial court should ultimately certify the proposed class.

{¶38} It follows that KNR's first assignment of error and Dr. Ghoubrial's assignment of error are sustained to the extent discussed above.

## KNR'S SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN CERTIFYING CLASS C (THE "INVESTIGATIVE FEE" CLASS) ON CLAIMS NINE (FRAUD), TEN (BREACH OF CONTRACT), ELEVEN (BREACH OF FIDUCIARY DUTY), AND TWELVE (UNJUST ENRICHMENT) OF THE SIXTH AMENDED COMPLAINT.

{¶39} KNR raises a second assignment of error wherein it challenges the trial court's certification of Class C, the investigative fee class. KNR maintains that the trial court ignored the

fact that KNR's standard attorney-client contract contained a provision that allowed the firm to seek reimbursement for reasonable expenses. KNR further argues that resolving the controversy in a single adjudication with common evidence would be highly difficult given that the extent of investigative services performed varied from case to case, meaning that an individual analysis of each case would be required in order to determine whether the investigative fee charge was reasonable.

{¶40} This Court remains mindful that we review the trial court's order certifying a class pursuant to Civ.R. 23 for an abuse of discretion. *Setliff*, 2009-Ohio-400, ¶ 5.

{¶41} In certifying Class C, the trial court found that all of the plaintiffs were exposed to the same allegedly fraudulent conduct, namely a standardized fee that was deducted from their settlements. While the charge was purportedly for investigative services, the plaintiffs claimed that no investigative services were provided and that the fee was actually a sham sign-up fee. The trial court found that generalized proof could show that KNR lacked any sort of accounting for the investigative services provided. The trial court stressed that the core allegation was that the fee was "an across the board sham, a subterfuge through which KNR extracts payment from their clients for the ordinary overhead cost of performing a 'sign up.'" Because the alleged fraud involved "a single underlying scheme [with] common misrepresentations" that could be subject to common proof, the trial court concluded that common questions among class members predominated. Significantly, the trial court observed that "it does not matter whether differences exist between the nature and value of the 'investigatory' services provided to the individual class members [because] these services had nothing to do with the true rationale for charging the investigation fee."

{¶42} KNR's argument that the trial court abused its discretion by disregarding the terms of the contractual relationship between the parties is without merit. There is no dispute that the class members entered into an agreement with KNR for legal services and agreed to have certain expenses deducted from their settlements. While KNR emphasizes that all of its clients agreed to be responsible for reimbursement of "reasonable expenses[,]" the gravamen of the alleged fraud is that the investigative fee charge was a sham and bore no rational relationship to any investigative services provided, meaning the clients could not have agreed to the charge. The claims with respect to the investigative fee class are based upon a standardized charge that applied to all class members as well as an alleged common misrepresentation as to the basis for that charge. "At the certification stage in a class-action lawsuit, a trial court must undertake a rigorous analysis, which may include probing the underlying merits of the plaintiff's claim, but only for the purpose of determining whether the plaintiff has satisfied the prerequisites of Civ.R. 23." *Stammco L.L.C. v. United Telephone Co. of Ohio*, 136 Ohio St.3d 231, 2013-Ohio-3019, at syllabus. To the extent that KNR would seek to defend against those claims by demonstrating that the charge was duly incorporated into its standard attorney-client agreement, it has failed to demonstrate on appeal that the trial court abused its discretion in concluding that the issue could be resolved with evidence common to all class members in a single adjudication.

{¶43} KNR also argues that the trial court abused its discretion in certifying Class C because an individual analysis of nearly 40,000 cases would be required in order to determine whether investigative services were performed. In certifying the class, the trial court found that there was "no evidence that KNR kept track of the specific 'investigatory' tasks 'investigators' performed on a case-by-case basis so the Defendants' claim of actual services performed, or individual inquiries required, is pure speculation as KNR saw no purpose in maintaining the data."

As noted above, the nature of the alleged fraud is critical. The investigative fee scheme hinged on the allegation that the charge was not connected to investigative services. The trial court concluded that the predominance requirement was satisfied because common evidence could either prove or disprove the plaintiffs' claim that KNR charged an across-the-board investigative fee that had nothing to do with investigatory services and was actually a sign-up fee that covered the cost of securing clients. It is well settled that "[i]f a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis. * * * Courts also generally find that a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices." *Baughman v. State Farm Mut. Auto. Ins. Co.*, 88 Ohio St.3d 480, 490 (2000), quoting *Cope v. Metro Life Ins. Co.*, 82 Ohio St.3d 426, 430 (1998). Under these circumstances, where the alleged fraud involved standardized charges and misrepresentations common to all class members, we cannot say that the trial court's decision to certify the investigate fee class was unreasonable, arbitrary, or unconscionable.

{¶44} KNR'S second assignment of error is overruled.

### III.

{¶45} KNR's first assignment of error is sustained. Dr. Ghoubrial's sole assignment of error is also sustained. KNR's second assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part and remanded for further proceedings consistent with this decision.

Judgment affirmed in part,
reversed in part,
and the cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

BRADLEY J. BARMEN, Attorney at Law, for Appellant.

JAMES M. POPSON, Attorney at Law, for Appellants.

THOMAS P. MANNION, Attorney at Law, for Appellants.

R. ERIC KENNEDY and DANIEL P. GOETZ, Attorneys at Law, for Appellants.

PETER PATTAKOS and RACHEL HAZELET, Attorneys at Law, for Appellees.